
U.S. Department of Justice

United States Attorney
Eastern District of New York

JRS/MWG/ALK
F. #2020R00146

271 Cadman Plaza East
Brooklyn, New York 11201

December 23, 2024

By ECF

The Honorable LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Leyla Carranza
               Criminal Docket No. 20-228 (S-2) (LDH)

Dear Judge DeArcy Hall:

      The government respectfully submits this letter in connection with the defendant's sentencing, currently scheduled for February 28, 2024 at 12:00 p.m.

      As set forth in detail below, the defendant — along with her co-defendants Juan Amaya-Ramirez and Oscar Flores-Mejia — murdered 17-year-old Andy Peralta. The defendant spent weeks speaking to Peralta online as part of a plan to lure him to his death. When she finally convinced Peralta to meet her in person in Kissena Park, she led him to her co-defendants, who ambushed him and beat, stabbed and choked him to death. While the murder was in progress, the defendant went to wait in Amaya-Ramirez's car, where she went through Peralta's phone to delete all of his communications with her in an effort to cover her tracks. After her co-defendants met her in the car, covered in blood, they all got high together and then she and her co-defendants destroyed Peralta's phone. Peralta's mangled body was left face down in a muddy puddle, with his pants pulled down around his ankles, while his mother desperately called his disabled phone, again and again, trying to find him.

      No amount of effort in writing this submission or arguing this case can convey the horror of the defendant's crime. A 17-year-old child is dead. The suffering he faced as he was beaten to death, terrified and alone, cannot be imagined. He is never coming home. And his family's lives have been shattered.

      At the same time, the government recognizes that the defendant herself was 17-years old at the time of the crime. And while the defendant's conduct cannot be excused — and while there is every indication that the defendant participated willingly and without hesitation — the government further recognizes that the defendant is less culpable than her co-defendants,

who planned the murder, recruited the defendant into the scheme, and murdered Peralta with their own hands.

Balancing all of the circumstances of this case, the government respectfully submits that a sentence of 22 years' imprisonment is appropriate. Such a sentence appropriately reflects the seriousness of the defendant's conduct and its consequences, while also taking into account her age and role. Moreover, such a sentence avoids an unwarranted sentencing disparity with the most comparable recent case, United States v. Lidia Delcarmen-Rodriguez, No. 19-CR-431 (JFB), a case that also involved a juvenile luring an innocent boy to his death on behalf of MS-13, where a 22 year sentence was also imposed.

I. Background

A. The Life of Andy Peralta

Andy Peralta was born in May 2000 in Ecuador, where his family lived in poverty. When he was two, his parents left to the United States to find work, leaving Peralta with his grandmother. His parents ultimately settled in Queens, where his father worked in construction, while his mother cleaned houses and restaurants but studied to become, and eventually became, a manicurist.

For over a decade, Peralta's parents worked to save money to bring him here as well. Eventually, they were able to hire an attorney to obtain a visa for him. At 15, he immigrated to the United States, where he was reunited with his parents and with his younger brother, who had been born here.

Peralta's transition to the United States was difficult at first. In addition to the stresses of a new life in a new country, he had been away from his family for years, and he carried some resentment that they had not brought him with them in the first place. His parents worked every day of the week. For a time, Peralta struggled in school and hung out with members of the 18th Street gang.

That began to change in October 2017, when Peralta began to date his girlfriend. They spent almost every day together, with Peralta's girlfriend coming to his home after school and he walking her home at the end of the day. According to officials at his high school and friends of Peralta interviewed as part of the investigation, Peralta's grades and attitude all improved after he began dating his girlfriend, and he stopped associating with members of 18th Street. Over time, his relationship with his parents improved as well.

As 17-year-olds sometimes do, Peralta and his girlfriend engaged in many displays of puppy love. They exchanged rings to symbolize wedding bands. They wore matching necklaces with half-heart charms, inscribed with each other's names and the date of their anniversary, that would combine to form a full heart. And at some point they obtained matching crown tattoos on their chests, with Peralta getting a blue king's crown with his girlfriend's name under it, and his girlfriend getting a red queen's crown with Peralta's name written under it. A photograph of Peralta's tattoo (on the left) and a photograph of Peralta with his girlfriend (on the right), with her tattoo visible (but her face redacted), are shown below:

2



On April 23, 2018, Peralta came home with his girlfriend, as he did almost every other day. His mother gave his girlfriend a facial, and he sat with his mother and served her dinner. His mother eventually went to pick up Peralta's younger brother. When she came home, Peralta had already walked his girlfriend home and was getting ready to go out again. He said he was meeting a girl at a park and would be home soon. He left at around 6:45 p.m.

When Peralta did not return home within a few hours, his family grew worried. His father called him. His girlfriend called him. According to phone records, between 9:27 p.m. and 12:39 a.m., his mother called him a dozen times, with each call going to voicemail. At approximately 1:30 a.m., they reported him missing to the police.

They never saw him alive again.

B. The Murder of Andy Peralta

The government is prepared to prove the following facts regarding Peralta's murder at a <u>Fatico</u> hearing.

Amaya-Ramirez and Flores-Mejia had been associates of MS-13 in El Salvador, but neither were active with a clique in the United States. Flores-Mejia befriended another individual ("Individual-1") at high school and introduced Individual-1 to MS-13, MS-13 rules, MS-13 music and other MS-13 associates and "wannabe" members of MS-13. As part of their preparations to become more active with MS-13, Flores-Mejia, Amaya-Ramirez, and Individual-1 would patrol Flushing Park to protect it from rival gang members and would deface any graffiti they found from the rival 18th Street gang.

In June 2017, before Peralta stopped associating with the 18th Street gang, one of Peralta's friends had made a Facebook Live video showing a group of people singing together in a car, including Peralta. At one point in the video, Peralta made an 18th Street gang sign. A still image from the video showing Peralta making the gang sign is shown below.



In approximately early 2018 (after Peralta had stopped associating with 18th Street), Flores-Mejia found the video on Facebook and showed it to Individual-1. Flores-Mejia asked Individual-1 if he was going to do something about the "chavala" — a slang term for a gang rival — and told him that if he killed someone on behalf of MS-13, any clique would accept him as a member.

Flores-Mejia, Amaya-Ramirez and Individual-1 ultimately agreed to kill Peralta. They spoke about it on multiple occasions, and Flores-Mejia and Amaya-Ramirez sometimes surveilled Peralta at his high school. Amaya-Ramirez raised that they needed to find a way to kill Perala without anyone finding out, and Flores-Mejia suggested that they should find someone to lure Peralta to a park where they could ambush him.

At the time, Amaya-Ramirez was dating the defendant, who was also close friends with Flores-Mejia and Individual-1. The defendant was from El Salvador and knew about MS-13, as well as Amaya-Ramirez's, Flores-Mejia's and Individual-1's association with MS-13. Photographs from the defendant's iCloud account from around the time of the

murder showing her with Amaya-Ramirez and Flores-Mejia are shown below.  In the photograph on the left, Flores-Mejia is at the top, the defendant is on the bottom left, and Amaya-Ramirez is on the bottom right; a fourth individual has been redacted.  In the photograph on the right, Flores-Mejia is to the far left, the defendant is in the center, and Amaya-Ramirez is to her right; Amaya-Ramirez is displaying an MS-13 gang sign, which the defendant is attempting to copy.



Flores-Mejia showed the defendant the video of Peralta and told her, "tenemos que pegar al chavala," which meant they had to kill a rival gang member, and explained that they wanted to kill Peralta because he had thrown an 18th Street sign.[1]  Flores-Mejia asked Amaya-Ramirez and the defendant if the defendant would help lure Peralta.  Amaya-Ramirez said that it was okay with him if the defendant wanted to do it, and the defendant agreed to help.  The defendant then sent Peralta a friend request on Facebook.

For the next month, the defendant spoke to Peralta online, building a relationship with him.  Eventually, she suggested that they meet in person in Kissena Park.  When Peralta came to the park, the defendant met him outside the park and led him to an isolated, pre-planned location.  The defendant had taken Peralta's phone by saying that she wanted to take a picture of them.  Peralta asked for his phone back, but the defendant would

---

[1] The Spanish verb "pegar" can have many meanings, including to hit.  In the context in which it was used here, it meant to kill.

5

not give it back to him. When they arrived at the pre-planned location, Amaya-Ramirez, Flores-Mejia and Individual-1 were waiting. Amaya-Ramirez told the defendant to go wait in the car, which she did, taking Peralta's phone with her.

Individual-1 pulled up the Facebook video and showed it to Peralta, asking if he was a chavala. Peralta said that he had been but was no longer active with the gang. Flores-Mejia ordered Peralta to lift up his shirt, and when he did, the men saw his crown tattoo. Flores-Mejia incorrectly stated that this tattoo meant that Peralta was a high-ranking gang member and instructed Amaya-Ramirez and Individual-1 to start assaulting Peralta.

They all beat him for 30 minutes, but Peralta did not die. Amaya-Ramirez then choked Peralta while Flores-Mejia stomped on his face and Individual-1 punched him in the stomach and held down his legs. Peralta tried to speak while Amaya-Ramirez strangled him, but he could not be understood. Peralta bled profusely and eventually stopped moving. Flores-Mejia then flipped Peralta over and stabbed him repeatedly in the back. Flores-Mejia also slashed at Peralta's crown tattoo.

When the assault was done, the men took a trophy photograph of themselves over Peralta's body. Amaya-Ramirez took the photograph with Flores-Mejia's phone while Flores-Mejia posed with his hand on Peralta's throat. Amaya-Ramirez's and Individual-1's hands are visible in the photograph, and all three are making MS-13 gang signs. Flores-Mejia shared the photograph with Amaya-Ramirez and Individual-1, and Amaya-Ramirez took a screen shot to save for himself. A copy of the photograph, as found in Amaya-Ramirez's iCloud account, is shown below.

Although this photograph and the photographs below are graphic and disturbing, the government submits that it is appropriate for the Court to see evidence of the full extent of the defendants' conduct before imposing sentence. To protect Peralta's and his family's privacy, the government respectfully requests permission to file an unredacted copy of this submission under seal and to redact this photograph and the below photographs from the publicly filed version.



The men then dragged Peralta's body by his hands to a small body of water and dropped him face down in the mud. His pants and underwear came down as he was dragged. Photographs of Peralta's body as it was found the following morning, as well as the injuries to his face, neck and chest, are shown below.



The three men went to Amaya-Ramirez's car, still wearing their bloody clothes, and met with the defendant. While waiting, the defendant had deleted all of the communications with her from Peralta's phone and Facebook account. The men changed into clean clothes they had brought, and the four then went to buy marijuana and smoke together. They later all stomped on Peralta's phone and threw it in a reservoir and threw away the bloody clothes.

C.   Subsequent Events

The investigation into Peralta's murder went cold for over a year. Because the men who killed him were strangers to him, and because the defendant had destroyed the digital trail between herself and Peralta, there was little evidence available to tie the defendants to the crime. The crime was solved only because Amaya-Ramirez repeatedly bragged about the murder to anyone who would listen, including by showing off the photograph of Peralta's body that he kept saved on his phone. The government is aware of at least four individuals Amaya-Ramirez bragged about the killing to on separate occasions. One of the individuals he bragged to was co-defendant Ismael Santos-Novoa, a local leader of the Indios clique of MS-13, and as a result Amaya-Ramirez was ultimately able to join the Indios clique.

The defendant remained in a relationship with the defendant at least until June 2020, after Amaya-Ramirez was indicted for Peralta's murder. She also remained in contact for a time with other members of MS-13, including Santos-Novoa, whose number was saved in her contacts under his gang nickname, "Profe."

D.   The Defendant's Indictment, Arrest and Guilty Plea

The defendant was indicted on June 15, 2023 for (1) cyberstalking resulting in death (Count Six), (2) conspiracy to murder in aid of racketeering (Count Seven), (3) conspiracy to assault in aid of racketeering (Count Eight), (4) assault in aid of racketeering (Count Nine), and (5) murder in aid of racketeering (Count Ten).

The defendant was arrested on June 20, 2023. The defendant was advised of her Miranda rights, which she waived, and she gave a post-arrest statement. In addition to admitting to sending Peralta messages and leading him to the park, the defendant admitted that she had taken Peralta's phone, and admitting knowing that all the messages had been deleted from it and that the phone had been thrown in a sewer. She also admitted knowing that a "chavala" refers to a member of the 18th Street gang. The defendant, however, claimed that she had not known that they were going to kill Peralta and denied involvement in deleting the messages from the phone.

On April 22, 2024, the defendant pleaded guilty to the cyberstalking of Peralta, resulting in death, in violation of 18 U.S.C. §§ 2261A(2) and 2261(b)(1).

II.   Victim Impact

The government has received a victim impact statement from the Peralta family. The statement is in Spanish, and the government is having it translated into English. The government will provide the Court, the defendant and Probation with a copy of the letter once the translation is available.

9

III. Sentencing Guidelines

The government respectfully submits that the Guidelines offense level is 42, as set forth below:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. §§ 2A6.2(c)(1), 2A1.1) | | 43 |
| Plus: | Obstruction of Justice (U.S.S.G. § 3C1.1) | +2 |
| Less: | Acceptance of Responsibility (U.S.S.G. § 3E1.1) | -3 |
| Total: | | 42 |

An offense level of 42 and a criminal history category of I yields an advisory Guidelines range of imprisonment of 360 months to life.

The government acknowledges that this offense level is higher than that estimated in the parties' plea agreement. At the time, the government erroneously failed to include an enhancement for obstruction of justice. Nevertheless, the government submits that such an enhancement is warranted here, as the defendant "destoy[ed] or conceal[ed] evidence that [was] material to an official investigation or judicial proceeding" — specifically, her messages with Peralta and his phone. U.S.S.G. § 3C1.1 application note 4(D). Numerous courts have held that destroying similar evidence, even when the destruction occurs almost contemporaneously with the crime, requires imposition of an obstruction enhancement. See United States v. DeLeon, 437 F. Supp. 3d 955, 1017-18 (D.N.M. 2020) (obstruction enhancement applied where defendant burned a victim's body and car); United States v. Bryant, 356 F. Supp. 3d 216, 221-22 (D. Conn. 2018) (obstruction enhancement applied where defendant cleaned up a murder scene after a murder); United States v. Yuselew, No. 09-CR-1035 (JB), 2010 WL 3834418, at *12 (D.N.M. Aug. 5, 2010) (obstruction enhancement applied where defendant attempted to bury murder weapon). Notably, the Guidelines were amended in 2006 to specifically extend § 3C1.1 to conduct occurring before an investigation begins if it is intended to conceal evidence from any investigation that might later occur. See United States v. Rising Sun, 522 F.3d 989, 996 (9th Cir. 2008) (attempting to destroy bloody clothing and threatening witness on night of murder did not warrant enhancement pre-2006 but would post-2006).

Moreover, while the Court need not find that the defendant's conduct actually hindered the investigation, there is no doubt that it did so. The communications the defendant deleted were never recovered. As a result of that missing evidence, the government very nearly did not charge her, even after learning of her role, out of concern that a conviction might be impossible without the digital evidence linking her to the crime. And indeed, absent her post-arrest admissions, any trial against the defendant would have been incredibly difficult because of doubts raised by the missing evidence she deleted. Without any exaggeration, the defendant's obstruction very nearly allowed her to get away with murder. An obstruction enhancement is therefore amply justified.

IV.   Legal Standard

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50.

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed —
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct; [and]
> >
> > (C) to protect the public from further crimes of the defendant.

18 U.S.C. § 3553(a)(1), (2). Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

Among the relevant facts the Court must consider are those set forth in Miller v. Alabama, in which the Supreme Court discussed differences between juvenile and adult behavior and characteristics, and distilled that discussion into four factors a sentencing court must consider when sentencing a juvenile defendant: (1) the defendant's chronological age and characteristics, including immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the family and home environment that surrounded the defendant; (3) the circumstances of the homicide offense, including the extent of the defendant's participation in the conduct; and (4) the possibility of rehabilitation (referred to herein as the "Miller factors"). 567 U.S. 460, 477-78 (2012).[2]

---

[2] While the government acknowledges that the Miller decision is applicable to this case, the Court should note that there are significant factual distinctions between the defendant and the Miller defendants, most importantly, the nature of the applicable murders and the significant premeditation present here, which was not the case in Miller.

11

V. Argument

The government respectfully submits that a sentence of 22 years — below the Guidelines range calculated above and below the Guidelines range set forth in the parties' plea agreement — is appropriate.

Such a sentence appropriately reflects the extraordinary seriousness of the defendant's conduct and the need to promote respect for the law. See 18 U.S.C. § 3553(a)(1), (a)(2)(A). There is no crime more serious than premeditated murder, and the murder here was unusually heinous and senseless. Peralta was a child. He was a stranger to the defendants who had done nothing wrong other than shown the wrong gang sign in a video from almost a year before his murder. The defendants gained nothing from the murder other than furthering Amaya-Ramirez, Flores-Mejia's and Individual-1's misguided hopes of advancing within MS-13. Moreover, the defendant willingly joined this scheme and spent a month luring Peralta. She could have turned back at any moment and chose not to. Indeed, even after the murder, the defendant helped conceal the crime and stayed with Amaya-Ramirez until after he was indicted over two years later. Thus, with respect to both § 3553(a)(1) and the third Miller factor (the circumstances of the homicide offense, including the extent of the defendant's participation in the conduct), the seriousness of the defendant's crimes warrants a significant sentence. Further, the level of planning and premeditation involved in the defendant's conduct also undermines any mitigating value contemplated by the first Miller factor (the defendant's chronological age and characteristics, including immaturity, impetuosity, and the failure to appreciate risks and consequences). This was not a crime committed in the heat of the moment by a reactive young person, it was a cold-blooded and premeditated hunt for prey.

A sentence of 22 years also appropriately reflects the need to deter similarly situated individuals from such conduct. See 18 U.S.C. § 3553(a)(2)(B). MS-13 has a well-established pattern of using girlfriends as lures for murders. While the Court should of course hold the people who brought the defendant into the scheme fully accountable for their choice to involve a minor in their murder plot, it is also important for the Court to send a clear message to every future young woman approached by her boyfriend to engage in a serious crime that such conduct will have profound consequences. In addition, as the Supreme Court has recognized, a higher sentence is necessary to achieve general deterrence in cases, such as this one, that are difficult to solve — here, in large part because of the defendant's own obstruction. See Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties.").

A 22-year sentence also reflects the defendant's personal history and circumstances, including her youth. Amaya-Ramirez and Flores-Mejia have entered into plea agreements ensuring that they will face sentences of at least 30 years' imprisonment, and the government intends to seek substantially higher sentences as to them. A 22-year sentence thus represents a substantial discount to account for the defendant's age and culpability. At the same time, an even lower sentence would risk undermining the seriousness of the offense and the loss to the Peralta family. That is particularly so where the defendant has shown only limited remorse for her crimes. At any point in the two years that the Peralta family was in agony, without any answers for what had happened to their son, the defendant could have brought them

relief. At any point in the five years between the crime and her arrest, the defendant could have done something to repent for her actions or to achieve justice for her victim. Instead, the defendant remained in a committed relationship with Amaya-Ramirez until after his indictment, including as he became more and more involved with MS-13. And even today, the defendant continues to minimize her involvement, claiming unpersuasively that she spent a month luring Peralta to an isolated spot in a wooded park just to arrange a fistfight and forcing the government to prove the full extent of her involvement at a Fatico hearing.

Finally, the government submits that a 22-year sentence appropriately avoids unwarranted sentence disparities. See 18 U.S.C. § 3553(a)(6). The most comparable case of which the government is aware is United States v. Lidia Delcarmen-Rodriguez, No. 19-CR-431 (JFB). In that case, Delcarmen-Rodriguez, then 16, helped her ex-boyfriend lure a suspected member of the 18th Street gang to a wooded area, where the ex-boyfriend shot and killed the victim — a 15-year-old boy. In 2023, the Honorable Joseph F. Bianco imposed a sentence of 22 years' imprisonment. See id., ECF No. 105 (sentencing transcript).[3]

In some ways, Delcarmen-Rodriguez's conduct was more serious: Delcarmen-Rodriguez was more closely affiliated with MS-13 than the defendant here, Delcarmen-Rodriguez was the one who had identified the victim as a potential member of 18th Street, and Delcarmen-Rodriguez had attempted to lure other individuals who either did not come or escaped. Delcarmen-Rodriguez, however, had not obstructed justice and therefore faced lower Guidelines. Moreover, Delcarmen-Rodriguez's personal circumstances were more mitigating than those here. In addition to being slightly younger than the defendant at the time of the charged conduct, Delcarmen-Rodriguez suffered years of horrific physical and sexual abuse by members of her family, leading to a suicide attempt shortly before the charged crime, circumstances Judge Bianco found substantially mitigating. Balancing all of those factors against each other, a similar sentence of 22 years is also appropriate here.

---

[3] In another case involving a juvenile serving as a lure in part for her MS-13 boyfriend, Judge Bianco sentenced the lure, Leniz Escobar to 50 years' imprisonment. See United States v. Leniz Escobar, No. 21-CR-101 (JFB). That case had numerous aggravating factors, including four victims killed in the attack, and Escobar's decision to proceed to trial rather than accept responsibility.

VI. Conclusion

For the foregoing reasons, the government respectfully submits that a sentence 22 years' imprisonment would be sufficient but not greater than necessary to achieve the goals of sentencing.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     /s/
Jonathan Siegel
Michael W. Gibaldi
Anna L. Karamigios
Sophia M. Suarez
Assistant U.S. Attorneys
(718) 254-6293 (Siegel)

cc: Clerk of the Court (LDH) (by ECF)
Counsel of Records (by ECF)
Jeremy J. Toner, United States Probation Officer (by Email)